**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

MAX BLUMENTHAL,

  *Plaintiff,*

v.

MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security,*

  *Defendant.*

CASE NO. _____

**DECLARATION OF PLAINTIFF MAX BLUMENTHAL IN SUPPORT OF MOTION FOR RETURN OF ELECTRONIC DEVICES UNLAWFULLY SEIZED BY CUSTOMS AND BORDER PROTECTION (CBP), AND FOR RETURN OF ANY CONTENT OBTAINED THEREFROM, PURSUANT TO FED. R. CRIM. P. 41(g)**

I, Max Blumenthal., declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.    I am a United States citizen. I have lived in Reston, Virginia for 2 years.  I am 48 years old. I am married and have two young children.

2.    I am a journalist, filmmaker, and author of four books, including a *New York Times* bestseller, with a journalism career spanning 25 years.  I have won several awards, including the Online Journalism Award and the Pierre Sprey Award for Defense Reporting and Analysis.

1

3.      My work has been published in news outlets including *The Nation*, *AlterNet*, *The Daily Beast*, *The Huffington Post*, the *New York Times*, and *Los Angeles Times*. Currently, I serve as Editor of an online news publication I founded known as *The Grayzone*.

4.      I have written extensively about United States foreign policy and our nation's relationship with the State of Israel; I am highly critical of both. I am a peaceful and law-abiding individual who has never been convicted of crime or credibily accused of a national security threat,

5.      To my knowledge, I am not the subject of any pending criminal investigation, and there is no search warrant, arrest warrant, or other judicial process authorizing the seizure or continued retention of my electronic devices.

6.      Prior to July 2026, I had once traveled to Iran, in May 2025, to participate in a public media festival, report on US-Iranian negotiations, and produce a documentary on Iran's Jewish community. When I returned to Washington, Customs and Border Protection (CBP) did not ask to search or confiscate my electronic devices.

7.      On July 3, 2026, I embarked on a 6-day trip to Iran to report on the funeral of Ayatollah Ali Khamenei, the largest gathering in human history. I entered Iran exactly as reporters working for establishment media outlets such as CNN and NBC did – on a press visa granted by the Iranian Foreign Ministry.

8.      While in Tehran, I participated in official press events alongside those mainstream reporters, who were also in the country to cover the Ayatollah's funeral. To my knowledge, none of the credentialed American journalists who also covered

2

the Khamenei funeral from Iran were subjected to interrogation or had their devices opened or seized by CBP agents upon their return to the United States.

9.    During my trip, I interviewed members of Iran's negotiation team, top political officials, academics and average citizens for a series of video and print reports for this news outlet, which I founded.

10.   I also visited various sites that the United States and Israel had bombed during the current war, including Gandhi Hospital, a neighborhood in Eastern Tehran, Azadi Football Stadium and Rafi-Nia Synagogue.

11.   I intend to use the information, photographs and videos I gathered during this trip to write news articles and produce news videos in the course of my employment as a journalist.

12.   I departed Tehran, Iran, on a local airline at 5:00 a.m. July 10, 2026. I arrived in Istanbul, Turkey in order to take a Turkish Airlines Flight Number 0008 (TK 0008) that was scheduled to depart at 3:55 p.m. on the same day to Virginia.

13.   I noted that my boarding pass for the flight from Istanbul to Dulles National Airport was marked with the letters "SSSS," which I understood to mean that I had been flagged by the U.S. Department of Homeland Security (DHS) for a secondary screening upon reentry into the U.S.

14.   I arrived at Dulles National Airport in Alexandria, Virginia at approximately 8:00 p.m. on July 10, 2026.

15.   My luggage included one checked suitcase, one carry on backpack, and a carry on bag containing two Persian rugs. I disembarked from the plane and proceeded to CBP screening along with other passengers from my flight.

3

16.   After receiving an "X" during mandatory CBP biometric screening, a CBP officer took my passport and placed it in a red box. I understood that meant I was not free to proceed. Another CBP officer then approached and directed me to a secondary screening room. I carried my passport in the red plastic box to that room.

17.   I arrived at the secondary screening room and waited approximately 20 to 30 minutes until another CBP officer appeared to question me at a metal table. A total of two CBP officers engaged in questioning me during secondary screening.

18.   One CBP officer searched my carry on bags, which contained a laptop computer and a digital camera, and asked questions about my identity and my work as a journalist. The CBP officer asked an array of questions which did not seem to relate to any potential criminal activity. For instance, they repeatedly asked whether I felt threatened at any point in Iran, and whether I was paid to conduct interviews in the country and how I paid for my travel to Iran. I politely responded that I had not felt threatened at any point, I was not paid to conduct interviews, and that I had covered my own travel expenses.

19.   The CBP officer then asked whether I had plans to return to Iran soon and I politely responded that I did not.

20.   After about 10 minutes of questioning, CBP officers escorted me to the baggage carousel so that I could identify and retrieve my luggage. I identified my luggage and carried it back to the secondary screening area along with the CBP officer who was accompanying me.

21.    The CBP officers searched my luggage. They then demanded that I surrender my phone or phones to them. I cooperated and turned over two mobile phones that I had on my person: a Google Pixel 6 and a Google Pixel 8.  CBP officers did not ask for, open, or take my laptop computer or digital camera.

22.    When I placed my two mobile phones on the table in front of the CBP officers, they said they were required to search my devices for evidence of criminal activity or child sexual material (CSM). The officers instructed me to unlock the devices and asked for my passcodes. I told the CBP officers that I would not open or provide the passcodes for my phone devices, as this violated my constitutional rights and threatened to compromise my journalistic sources and methods.

23.    The CBP officers responded that they would then detain my phone devices. One of the CBP officers told me that they were going to "hook them up to machines" in order to extract data from them, and that the process should take one day or so.

24.    Based on my experience as a journalist, I believe that DHS uses an Israeli technology called Cellebrite, which is designed to break through passcodes for phone devices and also obtain metadata that has been permanently deleted.

25.    CBP officers asked if my phones contained communications with my attorney. I did not understand the implication of the question and did not respond. My seized phones contained personal photographs of my family, contact information for sources, and communications with sources.

5

26.    I was detained by CBP for approximately 2.5 hours, after which officers returned my passport to me at approximately 10:30 p.m. I was permitted to take my luggage, including my laptop computer and digital camera.

27.    CBP officers kept my two phone devices and provided me with a telephone number to call about the status of my phone devices. I left Dulles Airport at approximately 10:30 p.m. exhausted from a long day's travel and the stress of being subjected to unwarranted questioning and harassment by CBP.

28.    I am concerned that forensic extraction technology may enable the Government to recover deleted data, including confidential journalistic information, source-related information, and other sensitive materials concerning my reporting and newsgathering activities.

29.    I have never been accused of involvement in any sort of abuse of children or child sexual exploitation. I am unaware of any such allegations against any friends, colleagues, or family members. To my knowledge, Iran is not a country known for child sex abuse or production of child pornography. If CBP officers were, in fact, searching for evidence of criminal activity or child sexual material, as they claimed, I do not understand why they did not also demand access to my laptop computer and digital camera.

30.    I believe that DHS and CBP targeted me due to my journalism, specifically my critical coverage of US foreign policy and long record of exposing Israeli atrocities. On July 7, 2026, a close associate of President Trump's and staunch supporter of Israel, Laura Loomer, from whom the President is known to take advice, published a

lengthy tirade on the social media platform X denouncing me and urging the administration to arrest me.



31.    On July 14, 2026, after CBP seized my phones, Loomer published a second post (depicted below) celebrating the seizure and describing me as a national security threat. The timing and content of those public statements reinforce my belief that I was singled out because of my protected reporting and viewpoints.



32.    I am concerned that CBP seized my phone devices to extract information on my sources, communications with sources, and journalist methods for conducting fieldwork and reporting.

33.    Disclosure of that information could endanger sources, compromise ongoing investigations, and impair my ability to assure current and prospective sources that their identities and communications will remain confidential.

34.    No one from CBP has contacted me about returning my phone devices. On July 14, 2026, I telephoned the phone number provided by the CBP officers who seized my phone devices.  I was connected to an automated answering service directing me to send an email to an email address to check on the status of seized devices.

35.    I am not comfortable contacting CBP electronically due to my concerns that it might expose me to further risk of unlawful surveillance or seizure by compromising my cloud accounts.

36.    I need the phone devices seized by CBP to conduct my work as a journalist, extract material for reports, and maintain contact with professional colleagues and sources.

Dated:  July 16, 2026                    Signed:

8